NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **BIG M, INC.** : | |
| : | **Civil Action No. 08-3567 (KSH)** |
| : | |
| **Plaintiff,** : | |
| : | |
| **v.** : | **FINDINGS OF FACT AND CONCLUSIONS** |
| : | **OF LAW** |
| **DRYDEN ADVISORY GROUP,** : | |
| : | |
| **Defendant** : | |

SHWARTZ, Magistrate Judge

## I.  INTRODUCTION

Plaintiff Big M, Inc., ("Plaintiff" or "Big M") brought this action against defendant

Dryden Advisory Group ("Defendant" or "Dryden") seeking damages for breach of contract and

breach of fiduciary duty and declaratory relief concerning the contractual relationship it had with

Dryden.  Dryden contends that Big M is equitably estopped from denying contractual liability

and has been unjustly enriched by the services Dryden provided.  Because the parties are citizens

of different states and the amount in controversy exceeds $75,000, this Court has subject matter

jurisdiction under 28 U.S.C. §1332(a)(2). See Final Pretrial Order ("FPTO"), dated May 1, 2009,

at §1.

The parties have consented to the jurisdiction of the United States Magistrate Judge to

resolve the case.  See 28 U.S.C. § 636(c); Docket No. 13.   Although the first page of the docket

states that the plaintiff requested a jury trial, a review of the clerk's cover sheet, complaint, answer and docket reveals that no party requested a jury trial.  See, e.g., Docket Nos. 1, 6.  Thus, a four-day bench trial commenced on June 8, 2009 and concluded on June 11, 2009.  During the trial, the parties presented testimony and exhibits, had a full opportunity to examine and cross-examine witnesses,[1] and vigorously argued their respective cases.  Based upon the trial record and the stipulations of the parties contained in the Final Pretrial Order, dated May 1, 2009 [Docket No. 17], the Court makes the following findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52.

## II. FACTS

### A. Background

Plaintiff is a New Jersey corporation that owns and operates approximately 157 retail clothing stores under the names "Mandees" and "Annie Sez" in seven or eight states.  Stipulation of Facts ("SOF") No. 1; Testimony of Robert Edmond ("Edmond Test.").  Big M generates

---

[1]The Court heard testimony from the following individuals:

| Witness | Relationship to the Parties |
|---|---|
| Lisbeth Baird Visone | Plaintiff's Financial Analyst |
| Robert Edmond | Plaintiff's Chief Financial Officer & Treasurer |
| Joseph Schiavone | Defendant's Sales & Use Tax Consultant & Director |
| John Ridley | President of Dryden |

In addition, defendant offered the deposition testimony of Ms. Visone and Mr. Edmond.

Because many of the facts are not disputed, the parties have the transcripts, and to expedite issuance this Opinion, the Court has identified the testimony from which the facts are based and only occasionally identified the precise page and line on which the testimony appears.

$270-300 million in net sales each year.  Edmond Test.  Big M collects sales taxes for taxable

goods it sells to customers and pays state sales taxes for goods and services it procures.  Id.

Plaintiff is also obligated to pay use taxes for taxable goods and services it purchases in one state,

but uses in another state where the sales tax rate is higher than in the state of purchase.  Id.  These

sales and use taxes can be "difficult to track, compute, and pay."  SOF No. 3.

      Dryden is a limited liability corporation organized under the laws of  Pennsylvania,

Notice of Removal at ¶ 4, and has offices in New Jersey and Pennsylvania.  SOF No. 3.  Dryden

has over 600 clients in a wide range of industries for whom it provides tax consulting services,

including sales and use tax refund reviews, audit defense, settlement negotiations, and

compliance reviews.  Testimony of John Ridley ("Ridley Test.");  SOF No. 2; Def. Ex. 41.

Dryden's website describes its sales and use tax review service as being "designed to obtain

refunds of overpaid sales and/or use taxes on transactions that are within the statute of limitations

for refund in one or more states."  Id.

      In 2004, Dryden offered to review plaintiff's books and records to determine whether or

not Big M was eligible for a tax refund for overpayment of sales and use taxes.  SOF No. 4.

Edmond testified that he first heard of Dryden in late 2003 or early 2004.  Edmond Test.  He

testified that he received a mailing describing services that Dryden performs, including reverse

audits to determine if there had been an over or under payment of taxes and preparation of refund

applications.  Id.  Visone testified that Edmond showed the brochure to her.  Testimony of

Lisbeth Visone ("Visone Test.").

      In 2004, Edmond and Visone met with representatives of Dryden at Big M Headquarters

in Totowa, New Jersey.  Edmond Test.; Visone Test.  During the meeting, Dryden discussed

performing a reverse audit to determine whether or not Big M over or underpaid its sales and use taxes.  Edmond Test., Visone Test.  If an overpayment was found, then Big M could decide whether or not to apply for a refund.  Edmond Test.; Visone Test.  In consideration for this service, Dryden would be paid a portion of the refund.  Edmond Test.; Visone Test.  During the meeting, Dryden advised that it would review accounts payable documents, Edmond Test.; Visone Test., look out for liability and exposure, provide training in areas where the plaintiff had exposure, and teach plaintiff how to apply for refunds.  Visone Test.  Visone told Edmond that seeking a refund would invite a state tax audit and that she was against the project.  Visone Test.  Edmond nonetheless wanted to proceed with the reverse audit and refund claim.  Id.  Despite her concerns, she did not voice them in Dryden's presence because she did not think that it was her place.  Id.

B. May 2004 Agreement

Edmond testified that he was willing to pursue the reverse audit because he viewed it as a "win-win" situation in that Big M would obtain money without having to incur expenses.  Edmond Test.  He testified that he did not want to pursue any refund application if it would result in an audit that required Big M to pay any additional moneys to the state.  Id.  Thereafter, by way of letter agreement dated May 18, 2004, Big M engaged Dryden to perform a "reverse audit" of the sales and use taxes Big M had paid for the years 2001, 2002, 2003, and 2004.  SOF No. 5; Pl. Ex. 1.  With respect to the scope of services, the agreement provided:

Dryden shall examine Client's records relating to sales and use taxes for the Tax Period and, where applicable, apply for, Refund(s) for the Client.  In connection with these services, Dryden will:

1. Review the pertinent Client records for overpayment.  In order to quantify and substantiate the Refund claims, Dryden will examine the following for the Tax Periods:

- Accounts Payable files
- Chart of Accounts and Cost Center listing
- Monthly General Ledger for Use Tax liability accounts
- Records related to Fixed Asset additions
- Other pertinent records and/or documents that may provide supporting documentation for the petition for Refund

2. As may be mutually agreed upon, prepare, file, and process the relevant petition for Refund; and

3. As may be mutually agreed upon, secure the Refund from the applicable State authority and/or vendors.

Pl. Ex. 1 at 1. Edmond understood the agreement to require Dryden to review records to see if plaintiff overpaid its sales and use taxes, Edmond Test., and for the parties to "mutually" decide if the tax refund request would be filed with the state. Id.

With respect to the fees to be paid, the contract stated that:

[i]n consideration for performance of the aforementioned services to the Client[] Dryden's fee shall be thirty five percent (35%) of all Refund(s).

*   *   *   *

It is understood and agreed that the aforementioned services rendered by Dryden are on a contingent fee basis and, if no Refund amounts are recovered, the Client shall not be indebted to Dryden for any fees or costs whatsoever.

Id. Visone testified that there had been negotiations concerning the percentage of the contingency rate. Visone Test. Dryden initially requested a 50% percent contingency, but the parties ultimately agreed upon the 35% rate. Id. Joseph Schiavone, Dryden's Tax Consultant Director, testified that he is paid on a contingency for reverse audit work, but is paid an hourly rate for compliance and exposure reviews. Testimony of Joseph Schiavone ("Schiavone Test.").

After the contract was signed, Schiavone and his supervisor at the time, Bill Pilny, met with Edmond and Visone to discuss what he would do and the records he needed to conduct the reverse audit. Schiavone Test. Visone was identified as his point of contact for information for

the reverse audit, such as capital improvement files, use tax accrual downloads, general ledger codes, store numbers and locations.  Id.; Pl. Ex. 3 (listing topics he discussed at the meeting). Schiavone testified that there was no discussion about the possibility of a state tax audit or exposure for tax underpayment.  Schiavone Test.  Big M provided the account payable files, fixed asset records, and other items listed in the contract.  Edmond Test.  Without assistance from Big M, Schiavone independently reviewed active and historical files to look for refund potential.  Schiavone Test.  He labeled the invoices with the tax code, keyed the invoices into an Excel spreadsheet, and prepared the tax documents for filing with the State of New Jersey.  Id. Schiavone said that Dryden would not review the documents for underpayments unless it was part of the contract and that a reverse audit does not look for all underpayments, but rather only notes "significant" ones.  Transcript of Joseph Schiavone, dated June 10, 2009, at 26:23-24.  His definition of a "significant" underpayment varies depending on the size of the client and is determined in his sole discretion.  Id. at 27:2-5.  He alone decides whether or not to disclose this potential liability to the client.  Id. at 106:20-22.

Justin Hogan, a Dryden employee, assisted Schiavone with the reverse audit.  Id.  In compliance with Dryden's internal protocol to keep a record of exposures found, Hogan listed a series of items for which plaintiff had potential tax exposure.  Id.; Pl. Exs. 2, 5.  Approximately seventeen items were found to present potential tax exposure but Schiavone could not state the dollar amount of the exposure.  Schiavone Test.  Of the seventeen items, twelve transactions were initially listed in the State's preliminary report issued after the refund application was filed and seven were part of the final audit.  Id.  None of the seventeen items that Hogan identified were disclosed to the plaintiff before the refund application was submitted to the state because Schiavone did not view the exposures as being significant.  Id.

C. Pre-Refund Submission Disclosures

By way of letter dated November 8, 2004, Dryden informed Big M that it had completed its New Jersey sales and use tax refund review, Def. Ex. 4, concluded that Big M was due a refund of sales and use taxes in the amount of $63,373.18, and filed the tax refund application. Pl. Ex. 9; SOF Nos. 6, 7.  The letter did not disclose the seventeen items of potential tax exposure to the plaintiff.  Schiavone Test.  Moreover, Edmond testified that no one from the defendant told him that any underpayments were found or that there were areas of exposure or risk with respect to sales and use taxes.  Edmond Test.  Schiavone conceded that he did not disclose any exposures.  Schiavone Test.  He also testified that there was no discussion with Big M before the application was sent to the state nor did Dryden give Big M a copy of the refund application to review before it was filed despite having told Big M that it would file the application after meeting with the client and the contractual obligation that the parties reach a mutual decision about filing the application.  Schiavone Test.; Def. Ex. 4; Pl. Ex. 1.  Schiavone testified that he received a power of attorney before the application was filed, which empowered him to file the refund application on Big M's behalf and represent Big M "with respect to any audit functions and/or proceedings" related to the "Sales and Use Tax Refund Claim" for the years "10/31/00 - 06/30/04."  Schiavone Test.; Def. Ex. 4 (copy of a letter to Visone dated Nov. 8, 2009, advising the client that Dryden has completed the refund application and attached the refund application including the power of attorney); see also Pl. Ex. 9 (same letter to Edmond referencing, but not enclosing the attachment).

D. State of New Jersey's Response

By letter dated November 23, 2004, the State of New Jersey, Division of Taxation ("the state"), acknowledged receipt of Big M's refund application.  Pl. Ex. 11.  The state told Big M

that a refund application is not deemed complete until "sufficient supporting documentation substantiating the refund request has been provided." Id.  Additionally, the state advised Big M that "refund claims cannot be released until all tax liabilities have been satisfied." Id.  This document therefore provided the plaintiff with specific notice that further inquiry about the application was likely to determine whether or not it was entitled to a refund and that the state would be verifying whether Big M owed any taxes.  Id.

By way of letter dated January 7, 2005, Pl. Ex. 13, the state informed Big M that the refund application had been transferred to its Field Audit Branch/Newark Field Audit, the refund application would be "processed in conjunction with Big M's sales and use tax returns," SOF No. 8, and that the audit would focus on "Big M's potential underpayment of sales and use taxes for the years in question."  Id.  Edmond testified that he did not recall this letter causing him any concern because Dryden had just completed its review and found that plaintiff had overpaid its sales and use taxes.  Edmond Test.  Visone testified that she was not concerned about the audit because Big M is a New Jersey business with New Jersey vendors who likely included the sales tax in their invoices and defendant never mentioned that there were any exposures. Visone Test.

Visone also said that she was not surprised when the audit was announced because she fully expected it to occur in response to the refund application. Visone Test.  Visone testified that the plaintiff has been the subject of approximately ten audits since 1996.  Id.  In 1996, for example, Big M was audited in connection with its bad debt refund request submitted with the assistance of Arthur Consulting.  Id.; Edmond Test.  Arthur Consulting performed a reverse audit to identify credit card sales for which sales taxes were paid to the state for sales to customers who never paid the bill and hence Big M never collected the tax from the customer.  Visone Test.  Visone testified that she was advised that a refund request could trigger an audit, and in fact,

New York and Connecticut commenced audits following refund applications.  Id.  Arthur Consulting assisted in the post-refund audit but received no additional compensation because it was going to be paid a fee if the refund were approved.  Id.  Visone and Edmond explained that when an audit occurs Big M collects records, including the general ledger, accounts payable records, invoices, the records are reviewed to determine how the sales tax was calculated and to determine if any use tax is owed, and Big M meets with the taxing authority. Edmond Test.; Visone Test.  After the conference with the taxing authorities, a list of assets purchased is created and invoices for a test period are gathered to show compliance.  Visone Test  The documents are reviewed to determine if taxes were paid and, if not, whether or not taxes were due.  Id.

By way of email sent before March 26, 2005, the state sought to set up a pre-audit meeting on May 28, 2005 and obtain a list of transactions and copies of the invoices.  Def. Ex. 5.  The email also informed Big M that it would receive a letter identifying other documents that the state would seek.  Id.  In a March 26, 2005 email, Visone agreed to meet with the state auditor and advised the state that an outside firm prepared the refund request.  Id.  The state responded by email dated March 28, 2005 and advised Visone that it wanted to coordinate a pre-audit meeting between Big M and the outside firm. Id.  Visone testified that Dryden had a duty and was expected to assist Big M in substantiating the refund because it prepared the refund application. Visone Test.

E. Dryden's Role in the Refund Audit

Between April 4, 2005 and April 6, 2005, there were efforts to set up a meeting among Schiavone, the state, and Visone and the state indicated that it wanted to begin the audit within sixty days.  Def. Ex. 6.  Visone notified the state that she would be out of the office most of the summer and advised that the audit needed to start as soon as possible.  Id.   In response, the state

advised that they would come to Big M's offices on April 18 and 20, 2005.  Def. Ex. 6.  Visone

said that the state was invited to come to the offices even if Visone were not in the office and that

another employee was available to answer questions. Visone Test.  By way of email dated April

13, 2005, the state reported to Visone that it met with Dryden about the refund audit work, the

meeting went well, and that the state wanted to visit the plaintiff's office to begin the audit and

complete it as quickly as possible.  See Def. Ex. 7.  Thereafter, the state visited the Big M offices

several times to review documents.  Visone Test.

During these 2005 and 2006 visits, Big M produced documents that the state requested,

including expense documents for the test period.  Id.  In addition, Schiavone spoke with the state,

checked on the progress of the audit, and kept track of the consent forms that tolled the statute of

limitations for tax events that were within the period under examination.  Id.; SOF No. 9.

Schiavone also asked Big M to ask the state to separate the refund from the audit.  Visone Test;

Pl. Ex. 15.  Big M asked the state but it declined to do so.  Visone Test.; Pl. Ex. 17 (email dated

Feb. 8, 2006 from the state that indicates that a refund request is processed as part of an audit).

By way of email dated March 17, 2006, Schiavone informed Visone that if Big M wanted

Dryden to "defend the audit[,]" then Big M would have to sign a separate contract.  Def. Ex. 10.

Visone testified that she did not believe Big M needed Dryden's assistance because it involved

work that Big M regularly handles.  Visone Test.  She further testified that she believed an "audit

defense" occurs only after an assessment is imposed and because no assessment had been

imposed, no defense was needed.  Id.  As a result, she simply put the email aside and did not

discuss it with Edmond.  Id.

F. Disclosure of Preliminary Report of Taxable Expenses

On December 1, 2006, Shannel Taylor, a representative of the Division of Taxation, sent

an email to Visone that attached a document labeled "a preliminary report of taxable expenses for the sample year 2003 and fixed assets for 2001 to 2004" and requested additional information about hundreds of transactions listed in the report.  SOF No. 10; Def. Ex. 12.  The report listed over half of the total transactions in which Big M engaged during the relevant time period and included transactions for which the tax had been paid or described a transaction that was not subject to tax.  SOF No. 11.  Left unchanged, the preliminary report would have resulted in a tax bill to Big M of $2,636,000.[2]  Id.

In early 2007, Visone told Edmond that Dryden wanted to expedite processing the refund application and offered to give guidance in connection with the audit.  Edmond Test.; Visone Test.  By way of email dated January 12, 2007, Schiavone asked Visone about the status of the state's audit, advised that he had not heard from the state since August 2006, and expressed concern about the status of the statute of limitations tolling agreement that expired on December 31, 2006.  Def. Ex. 13.  In a responding email dated January 12, 2007, Visone advised Schiavone that a report was received, that the state had identified a tax due of $806,298,[3] and that she had already eliminated some of the transactions the state cited as the basis for the tax number.  Id. Apparently, a telephone call between Schiavone and Visone followed, and the contents of which were confirmed in an email in which Schiavone stated that he would contact Visone during the week of February 26, 2007, to make arrangements to review the audit "assessment" workpapers to see if the number could be further reduced.  Id.  Visone did not address his use of the word "assessment" because she knew an assessment had not occurred. Visone Test.  Schiavone also

_____

[2]The parties stipulated to this number but did not explain how it was calculated.  The tax numbers in the preliminary report totaled $1,837, 507.18 and did not include interest or penalties.

[3]According to the preliminary report, this number corresponds to the tax due for expenses and excludes the tax listed for the fixed assets.

testified that Visone did not question the use of the word "assessment" and that she used the same word herself.  Schiavone Test.  There was no discussion of fees for this review or his assistance and Visone testified that she believed Schiavone would perform these services for "free" because Arthur Consulting provided similar services without charging a fee and that Dryden would be paid the contingent fee on the amount of the refund. Visone Test.

G. March 6, 2007 Agreement

In an email dated January 15, 2007, Schiavone forwarded Visone a document he identified as "the new contract" for Mr. Edmond's signature.  Def. Ex. 16.  He said this "revised contract between Dryden and Big M, Inc., covers both refund review as well as audit defense work."  Id.  After January 12, 2007, and before February 16, 2007, Visone provided the contract to Edmond.  Visone Test.  Visone said that she told Edmond that Dryden wanted the contract "refreshed" and "re-signed," and that it was "just a formality."   Transcript of Lisbeth Visone dated June 9, 2009, at 92:19-22.  Although Visone initially told Schiavone that she wanted to review the workpapers and perhaps defend the audit herself, by late February 2007, she advised Schiavone that she wanted Dryden to do the work because she did not have the time to handle it.  Schiavone Test.  Schiavone believed that Visone was unable to complete the work given her other duties and her two day per week work schedule.  Id.  In response to her overture, Schiavone sent her another copy of the contract.  Id.  He testified that she never asked why the contract was needed or sought clarification about it.  Id.  He also testified that he never told her that it was only a formality or a reaffirmation of the initial contract.  Id.  He said the 2004 contract was for a separate service and the second contract was needed because it involved another major engagement.  Id.  He said that there was no discussion of compensation and never said that the audit defense work would be performed without compensation.  Id.  Visone testified that she

believed the work Dryden offered to perform was to facilitate the audit so that the refund would be approved and it would be paid and that its compensation was limited to the refund contingency amount.  Id.  She testified that no one from Dryden mentioned that it would be paid a fee, no less a substantial fee, based upon a reduction of the amount of money identified as due in the preliminary workpapers.  Id.

By way of email dated February 16, 2007, Schiavone inquired about the status of the "State's assessment" and of the new contract he had provided her.  Def. Ex. 17.  Visone testified that she understood Schiavone's use of the word "assessment" as a reference to the December 2006 workpapers.  Visone Test.  By way of email dated February 27, 2007, Visone told Schiavone that she had not reviewed any invoices, she invited Dryden to do it, and that she would forward the contract to Edmond.  Def. Ex. 18.  In response, Schiavone asked Visone to have the contract signed and faxed to Dryden and that once it is signed, he would arrange a time to review the accounts payable files.  Def. Ex. 19.  He also asked for a copy of the state's "workpapers" and the tolling agreement.  Id.  He also suggested that she call the state "to let [the state] know that Dryden will be defending the audit and therefore the Post Audit Closing Conference (POCR) to which [Dryden is] entitled (per the NJ Taxpayers' Bill of Rights) will not take place until after Dryden has completed its audit defense work."  Id.   By way of email dated March 5, 2007, Schiavone again asked for the workpapers, the tolling agreement, and the contract.  Def. Ex. 20.   In response, Visone indicated that the information would be provided. Id.  In an email dated March 6, 2007, Schiavone acknowledged receipt of the auditor's "worksheets" and again requested a copy of the signed contract and tolling agreement and told her that he would select a start date the week of March 12, 2007.  Id.  He further suggested that she contact the state to postpone the tentative meeting of March 26, 2007, "pending the audit

defense by Dryden." Id.  In response, Visone told him that Edmond had the contract and that she would forward it to him upon receipt.  Id.  Visone testified that she had to push Edmond to sign the contract, told him that the contract was described as being "just a formality," and that she made no mention of the email one year earlier about Dryden looking for a new contract for an audit defense because she believed that this would not be needed until an assessment occurred. Visone Test.

On March 6, 2007, the parties signed an agreement that Edmond characterized as reaffirming their 2004 agreement.  Edmond Test.  Edmond testified that he was told that signing the document was a formality and that it contained no substantive changes to the 2004 agreement.  Id.  Visone testified that she and Edmond compared the two agreements and, other than the title, the documents appeared to be the same.  Visone Test.  An inspection of the documents, however, reveals differences.  Pl. Ex. 1; Pl. Ex. 29.  The top of the March 2007 document reads "Sales and Use Tax Refund Review Agreement between Dryden Group LLC and: Big M." Pl. Ex. 29.  This does not appear on the May 2004 agreement.  Pl. Ex. 1.  In addition, a review of the March 2007 agreement makes specific reference to "assessments."  Pl. Ex. 29.  Specifically, with respect to the scope of services, the agreement provides that Dryden will "[p]repare, file, and process the relevant petition for Refund or Reduction of Assessments." Id. at 1.  According to the Edmond, as of March 6, 2007, there had been no assessment and that the state was still conducting the audit.  Edmond Test.  Visone testified that although Schiavone used the word "assessment" to refer to the workpapers, she understood that when the word was used in the 2007 contract that it referred to a formal act of the taxing authority.  Visone Test. Visone testified that she compared the two agreements and did not focus on anything concerning obligations flowing from an assessment because from her perspective no assessment had

occurred.  Visone Test.

According to Schiavone, however, the assessment starts with the disclosure of the preliminary workpapers.  Schiavone Test.  He testified that preliminary work papers "come out prior to the finalization of the assessment."  Transcript of Joseph Schiavone, dated June 10, 2009, at 11:12-13.  From his perspective, the preliminary assessment precedes a final assessment and "the auditor's work papers are preliminary."  Id. at 12:13-19.  He testified that items for which additional taxes are sought remain on the "assessment until the taxpayer . . .  has an opportunity to remove items."  Id.  He also testified that there is both a preliminary assessment and a final assessment and, stated that the work he performed for the plaintiff was before the final assessment as they were "defending the assessment work papers before finalization."  Id. at 12:18-19, 15:5-6.  Thus, his testimony is inconclusive on his understanding of the word assessment and whether the 2006 preliminary work papers constitute an "assessment" as that word is used in the 2007 contract.

The two agreements also differ in the definition of "refund."  In the May 2004 agreement, refund is defined as "all amounts recovered through the refund claim process and shall include refunds of sales and/or use taxes paid, interest (or imputed interest, if applicable), penalties, and amounts which are credited against another tax liability of the Client."  Pl. Ex. 1.  The March 2007 contract defines refund as:

> all amounts (tax, interest and penalties) recovered through the refund claim process.  It shall also include refund(s) and/or reductions of sales and or use taxes, interest (or imputed interest, if applicable), and penalties which have been either paid and/or been given notice of liability by a taxing authority as a result of an audit, and amounts which are credited against another tax liability of the Client

Pl. Ex. 29.  The word "assessment" is not used in this definition and the compensation clause does not use the word "refund".

As to fees, the March 2007 agreement states that "Dryden shall be entitled to a Contingent Fee based solely on recovered amounts or reductions of assessments."  Pl. Ex. 29 at 1. Edmond believed the fee to be paid to Dryden was limited to the percentage of the refund and nothing more.  Edmond Test.  Although he testified that he would not have signed an agreement that would have committed the company to pay a fee that may have been based upon a reduction of the figures in the preliminary report, he also testified that this a view he developed in hindsight. Edmond Test.  With respect to the additional language in the fee provision concerning a contingency based upon a reduction in the assessment, Visone testified that this language meant nothing to her because Big M was not assessed.  Visone Test.  Visone testified that she believed the fees were limited to the contingency based upon the amount of refund request.  Id.  She further testified that she would have declined to enter the agreement if she had known that the fee for services under the new contract was going to be calculated based upon a reduction in the number that appeared in the preliminary report. Id.  Visone believed that the number was baseless because the state auditor did not examine the documents that the state claimed supported the tax numbers in the preliminary report and that the state's number easily would be reduced. Id.

Schiavone testified that he did not notice that the title of the 2007 agreement said "Sales and Use Tax Refund Review Agreement between Dryden LLC and: Big M,"  Pl. Ex. 29, and that he had asked Dryden's sales department for an audit defense agreement.  Schiavone Test.  He acknowledged that the words "audit defense" does not appear in the agreement.  Id.  He also said he saw no need to refresh or renew the 2004 contract because the refund was completed when the 2007 contract was signed.  Id.  He recalls telling Visone that a revised contract would be provided for an audit defense and the email of January 15, 2007, from Schiavone to Visone

-16-

describes the contract as both "new" and "revised," Id.; Def. Ex. 16, but that there were no

discussions about the contingency fee or terms of the contract before 2008.  Schiavone Test.

H.  Activities after the signing of the 2007 Contract

After the contract was signed, Schiavone met with Visone and Edmond to discuss the

plan for the audit defense.  Schiavone Test.  Edmond directed him to review and defend each

item.  Id.  Schiavone learned no invoices had been gathered and he identified the documents that

he needed to review.  Id.  These documents were the same as those he had requested during the

refund application process, namely accounts payable files, use tax accrual journal, fixed asset

capital improvement files, general ledger codes, and a list of store numbers and locations.  Id.

Although both Schiavone and Visone called his work during this period an "audit defense,"

Visone said that she did not consider this process an "audit defense" but rather considered it

work performed to substantiate the refund claim. Visone Test.

During the audit, Visone had regular contact with the state and she received help

retrieving invoices and files from people in the accounting section and temporary employees.

Edmond Test; Visone Test.  In addition, Edmond assigned John Porcaro, the Director of

Accounting, to serve as Schiavone's full time point of contact at Big M.  Def. Ex. 35.

By way of letter dated April 25, 2007, Visone advised the state that Schiavone:

is currently reviewing your preliminary reports of taxable expenses and fixed
assets.  He feels that, based upon the volume of paperwork, that he will be able to
complete his review by the end of June (mere eight weeks away).  Therefore a
more realistic review date will have to be after June.

Def. Ex. 27.  She told the state that she and Schiavone "both look forward to putting this audit

behind us."  Id.  The letter made clear that Big M would be seeking an extension of the June 30,

2007 tolling agreement.  Id.  Visone testified that the state was against providing an additional

extension and it was only obtained after Edmond spoke with the head of the audit branch. Visone

Test.  By way of email dated May 16, 2007, Visone advised Edmond that the state tax auditor

visited Big M, that the state was "pressuring" Big M to complete the review in a short period of

time, and that Dryden was reviewing the vendor invoices and had stated that it believed Big M's

exposure is minimal.  Def. Ex. 31.

Schiavone testified that he started the review in March 2007 and finished in March 2008.

Schiavone Test.  He was given office space, telephone access, a copy machine, access to vendors

and Big M employees, and 20 boxes of accounts payable files and 40-45 redwells containing

information about capital improvements.  Id.; Visone Test.  He sorted the data by amount and

vendor name, examined the invoices and relevant documents, identified the portion of each

document that reflected the tax and highlighted the part of the document that reflected the

payment, gathered supporting documents if the payment or exemption was not self-evident from

the invoice, reviewed the tax accrual journal to find entries that showed payment of use taxes,

contacted vendors and Big M employees to retrieve missing information, identified categories for

exemption, and prepared arguments to support the exemptions.  Schiavone Test.  Schiavone then

created binders that contained documents to substantiate plaintiff's contention that sales tax for

the subject transaction was paid or the transaction was tax exempt.  Id.  Schiavone said while it

may not have been necessary to organize the documents in binders, using an organized approach

provided Big M a better opportunity to win the tax exemption.  Id.  He acknowledged that

hundreds of the transactions were obviously improperly included but others required a more

sophisticated analysis of documents to substantiate the reason why the transaction was tax

exempt.  Id.  This differs from the approach Visone said she would have followed. Visone Test.

She testified that she would have put all of the invoices in a box, met with the state, and

randomly pulled invoices to discuss each with the state.  Id.

By way of email dated October 12, 2007, Schiavone told Visone that he completed the expense portion of his work but he needed time to review the fixed assets and would not be ready to meet with the state before December 2007.  Def. Ex. 33.  In response, Visone told him that she spoke with the state and suggested that they have a conference with the state to select a date for a meeting.  Visone Test.  Although Visone questioned the amount of time Schiaonve needed to complete the work, she acknowledged that he was the expert and, because he was not receiving additional compensation, she agreed to his time frame.  Id.

According to Schiavone, there were five meetings with the state.  Schiavone Test.  Two meetings were dedicated to discussing the expenses and two or three meetings were spent discussing the assets.  Id.  During the meetings, Schiavone reviewed invoices and identified the portions that reflected whether or not taxes were paid and if no sales taxes were paid, provided an explanation.  Visone Test.   The state agreed to remove certain items and provided a revised worksheet.  Schiavone Test.  Schiavone then reviewed  the worksheet to be sure that all items that were to have been removed were in fact deleted.  Id.

The first meeting with the state was on October 29, 2007.  Schiavone Test.  During this meeting, Schiavone presented the state with three five-inch binders that contained the documentation that showed that certain expenses were improperly part of the states preliminary findings.  Id.  In addition, the state and Schiavone discussed another agreement to toll the statute of limitations until March 31, 2008.  Pl. Ex. 44.  According to the agreement, the amount of taxes due as to any return made by or on behalf Big M for periods the agreement covered "may be assessed at anytime on or before March 31, 2008."  Id. (emphasis added).  By way of email dated November 1, 2007, Schiavone advised Big M that he had received an extension of the audit defense until March 31, 2008 and had proposed a means to expedite the completion of the work

by asking the state to remove from consideration approximately $6 million of taxable items.  Def. Ex. 35.  Thereafter, Schiavone and Visone met with the state several more times and reviewed transactions and presented arguments.  Schiavone Test.  Visone was present for each meeting with the state but Schiavone did most of the talking.  Id.

I. Tax Assessment

 By way of letter sent via certified mail dated April 7, 2008, the State of New Jersey provided Big M two documents: (1) a breakdown reflecting the sales and use tax deficiencies, refund, penalty, interest, and the total due to the state of $301,727.89 and (2) CBT Audit Adjustment Summary.  Pl. Ex. 33; SOF 14.  Of the $301,727.89, $234,159.63 was the tax deficiency.  Pl. Ex. 33.  The state applied the refund totaling $56,083.05 as a credit, which resulted in a net tax deficiency of  $178,076.58.  Id.   The interest due totaled $113,078.02 and the penalty totaled $10,573.30.  Id.  Big M paid the state of New Jersey the full amount by way of check dated April 24, 2009.  Pl. Ex. 35.

J. Dryden's Bill for services

By invoice dated April 18, 2009, Dryden billed Big M $774,642.95, which remains unpaid.  SOF No. 15; Pl. Ex. 38.   The invoice was calculated based upon the difference between the tax that the state identified as being tax due in the preliminary report and the total net tax deficiency set forth in the April 7, 2008 letter.  Def. Ex. 12; Pl. Ex. 33; Pl. Ex. 38.  Dryden added to these amounts a percentage that it contends reflects the interest that would have been due if the amounts had not been reduced.  Pl. Ex. 38.  Dryden then sought payment from Big M totaling 35% of this amount.  Id.

Although the bill was directed to Mr. Edmond, it was first forwarded to Ms. Visone on whose desk it remained for several days.  Visone Test.  Edmond testified that he was

"flabbergasted" when he saw the bill and did not expect to see one of this magnitude because it purported to be based upon the preliminary report and not an assessment, which had not occurred at the time services were rendered.  Transcript of Edmond Test. dated June 8, 2009 at 43:13-21.  Ridley testified that when he spoke to Edmond, Edmond said he did not have the authority to pay the bill and that he neither made comments about the quality of the work performed nor accuse Dryden of causing the tax bill.  Ridley Test.

Plaintiff has declined to pay the bill and plaintiff has since implemented a policy that mandated that all contracts be presented to the legal department for its review.  Deposition Testimony of Robert Edmond.

K. <u>Federal Case</u>

On May 20, 2008, the plaintiff filed a Complaint in the New Jersey Superior Court, Passaic County, seeking damages for breach of contract, breach of fiduciary duty, and accountant malpractice, and requesting a declaratory judgment.  Docket No. 1.  The plaintiff did not preserve its malpractice claim in the Final Pretrial Order, and thus there is no malpractice claim in this case.  <u>See</u> Docket No. 17.

Defendant denies wrongdoing and in its Answer asserted counterclaims for breach of contract, unjust enrichment, and book account.  Docket No. 6.  The defendant did not preserve its book account counterclaim in the Final Pretrial Order.  Docket No. 17.

### III. <u>CONCLUSIONS OF LAW</u>

A. <u>Elements of a Legally Enforceable Contract</u>

To resolve this case, the Court must determine whether any legally enforceable contracts were created.  To establish a valid contract, a party must prove:

1. Meeting of the minds[, that is,] the parties reached an agreement to do what is alleged.
2. Offer and acceptance[, that is,] one party communicated a willingness to enter

-21-

into the agreement and the other party gave some outward indication that the
agreement was accepted.
3.   Consideration[, that is,] each party gave or promised something of value to the
other.
4.   Certainty[, that is,] the terms of the agreement were reasonably certain.

N.J. Jury Instr. Civ. 4.10 C; see also Weichert Co. Realtors v. Ryan, 128 N.J. 427, 435 (1992);

Am. Furniture Mfg. Inc. v. Value Furniture & Mattress Warehouse, Civ. No. 2995-06, 2009 WL

88922, *2 (N.J. Super. Ct. App. Div. Nov. 18, 2008) (quoting Ctr. 48 Ltd. P'ship v. May Dep't

Stores Co., 355 N.J. Super. 390, 405 (App. Div. 2002); Liebholz v. Harriri, Civ. No. 05-5148,

2006 WL 2023186, *11 (D.N.J. July 12, 2006).

### 1.   Meeting of the Minds

At issue in the 2007 contract is whether or not there was a meeting of the minds

concerning the services that were to be rendered and the fees that were to be paid for such

services.  The meeting of the minds requirement is "an essential element to the valid

consummation of any contract." Am. Furniture Mfg. Inc, 2009 WL 88922, *2 (quoting Ctr. 48

Ltd. P'ship, 355 N.J. Super. at 406).  The meeting of the minds element requires that the parties to

the contract "mutually agree and assent to the substance and terms" of the contract.  Marcangelo

v. Boardwalk Regency Corp., 847 F. Supp. 1222, 1229-30 (D.N.J. 1994) (quotation omitted).  A

contract is not legally enforceable without this "common understanding" of the terms.  Id. at 1230.

To have a meeting of the minds, both parties must manifest that they understand what each is

agreeing to do or not to do, and the "contracting party is bound by the apparent intention he or she

outwardly manifests to the other party."  Brawer v. Brawer, 329 N.J. Super. 273, 283 (App. Div.

2000) (quoting Hagrish v. Olson, 254 N.J. Super. 133, 136 (App. Div. 1992)).  Because the

parties' objective intent governs, the contract cannot be based upon the secret or hidden intention

or understanding of one party, and it is therefore "immaterial that he or she has a different, secret

intention from that outwardly manifested." Hagrish, 254 N.J. Super. at 136;  see also Schor v.

FMS Fin. Corp., 357 N.J. Super. 185, 191 (App. Div. 2002).  Subject to exceptions, where parties

to a contract attach different meanings to a term neither party is bound by the other's definition.

Norton v. Atlantic Chrysler Plymouth, Inc., Civ No. 981-08, 2009 WL 1258100, *3 (N.J. Super.

Ct. App. Div. May 8, 2009) (citing Restatement (Second) of Contracts §201(3) (1981)). [4]  A

contract is usually found to be unenforceable "[w]here the parties do not agree to one or more

essential terms . . . ." Weichert Co. Realtors, 128 N.J. at 435.

       2. Offer and Acceptance

      To find a legally enforceable contract, there must also be offer and acceptance.  Id.  An

offer is the "manifestation of willingness to enter into a bargain, so made as to justify another

person in understanding that his assent to that bargain is invited and will conclude it." Fletcher-

Harlee Corp. v. Pote Concrete Contractors, Inc., 482 F.3d 247, 250 (3d Cir. 2007) (quoting

Restatement (Second) of Contracts § 24 (1981)).  When analyzing the "offer" component, the

main focus is on the intention of the party. Fletcher-Harlee Corp. v. Pote Concrete Contractors,

---

[4] The Restatement (Second) of Contracts Section 201 states, in relevant part:

(1) Where the parties have attached the same meaning to a promise or agreement or a term thereof, it is interpreted in accordance with that meaning.
(2) Where the parties have attached different meanings to a promise or agreement or a term thereof, it is interpreted in accordance with the meaning attached by one of them if at the time the agreement was made
(a) that party did not know of any different meaning attached by the other, and the other knew the meaning attached by the first party; or
(b) that party had no reason to know of any different meaning attached by the other, and the other had reason to know the meaning attached by the first party.
(3) Except as stated in this Section, neither party is bound by the meaning attached by the other, even though the result may be a failure of mutual assent.

Restatement (Second) of Contracts § 201 (1981).

Inc., 421 F. Supp. 2d 831, 834 (D.N.J. 2006).  A valid offer contemplates the creation of a legal

relationship with rights and duties upon its acceptance and the intention to assume liability.  Id.

(citing Trs. of First Presbyterian Church in Newark v. Howard Co. Jewelers, 12 N.J. 410, 414

(1953)).  When determining if an offer is valid, the criteria is "upon 'what meaning the words

should have conveyed to a reasonable person cognizant of the relationship between the parties and

all of the antecedent and surrounding facts and circumstances.'" GFS/Morristown Ltd. P'ship v.

Vector Whippany Assocs., Civ. No. 3754-94, 2009 WL 857002, *13 (N.J. Super. Ct. App. Div.

Apr. 2, 2009) (quoting Esslinger's, Inc. v. Alachnowicz, 68 N.J. Super. 339, 344 (App. Div.

1961)).

        A binding contract is not formed unless there is an acceptance to the party's offer.

Weichert Co. Realtors, 128 N.J. at 435-436.  The acceptance fulfills the requirement of mutual

assent.  Id.; Antonelli v. Resnick, Civ. No. 12008-03, 2007 WL 1238578, *5 (N.J. Super. Ct. App.

Div. Apr. 30, 2007) (citing Restatement (Second) of Contracts § 50 (1981)).[5]  To be effective and

create a binding contract, the acceptance must be absolute and match the terms of the offer.  State

v. Ernst & Young, L.L.P., 386 N.J. Super. 600, 612 (App. Div. 2006).

        3. Consideration

        Consideration is "a bargained-for exchange of promises or performance that may consist

_____

        [5]The Restatement (Second) of Contracts Section 50 states, in relevant part:

        (1) Acceptance of an offer is a manifestation of assent to the terms thereof made
        by the offeree in a manner invited or required by the offer.
        (2) Acceptance by performance requires that at least part of what the offer
        requests be performed or tendered and includes acceptance by a performance
        which operates as a return promise.
        (3) Acceptance by a promise requires that the offeree complete every act essential
        to the making of the promise.

 Restatement (Second) of Contracts §50.

of an act, a forbearance, or the creation, modification, or destruction of a legal relation."

Commerce Bancorp, Inc. v. BK Int'l Ins. Brokers, Ltd., 490 F. Supp. 2d 556, 561 (D.N.J. 2007);

Fregara v. Jet Aviation Bus. Jets, 764 F. Supp. 940, 948 (D.N.J. 1991) (quoting Restatement

(Second) of Contracts §71 (1981)).[6]  The element of consideration requires that "both sides must

get something out of the exchange."  Classic Home Realty v. E.J.G. Props., Inc., Civ. No. 5218-

06, 2008 WL 4935908, *1 (N.J. Super. Ct. App. Div. Nov. 20, 2008) (internal quotes omitted)

(quoting Cont'l Bank of Pennsylvania v. Barclay Riding Acad., Inc., 93 N.J. 153, 170 (1983)).

Even a slight advantage or inconvenience constitutes valid consideration as "equivalence is not

required." Classic Home Realty, 2008 WL 4935908, *1 (citing Martindale v. Sandvik, Inc., 173

N.J. 76, 87 (2002)).

 4. Certainty

 To be enforceable, a contract's terms must be reasonably clear.  Weichert Co. Realtors,

128 N.J. at 435. Thus, "[a]n agreement so deficient in the specification of its essential terms that

the performance by each party cannot be ascertained with reasonable certainty is not a contract,

and clearly is not an enforceable one."  Baer v. Chase, 392 F.3d 609, 619 (3d Cir. 2004) (quoting

---

[6]The Second Restatement of Contracts, Section 71 states, in relevant part:

(1) To constitute consideration, a performance or a return promise must be bargained for.
(2) A performance or return promise is bargained for if it is sought by the promisor in exchange for his promise and is given by the promisee in exchange for that promise.
(3) The performance may consist of
(a) an act other than a promise, or
(b) a forbearance, or
(c) the creation, modification, or destruction of a legal relation.
(4) The performance or return promise may be given to the promisor or to some other person. It may be given by the promisee or by some other person.

Restatement (Second) of Contracts §71 (1981).

Lo Bosco v. Kure Engineering Ltd., 891 F. Supp. 1020, 1025 (D.N.J. 1995)).  A court must be

able to accurately determine with reasonable certainty each party's obligation to enforce the

contract.  Id.  The terms of a contract are certain if the court can determine the existence of a

breach and provide an adequate remedy. Mobilio v. Schwartz, Civ. No. 38-02, 2007 WL 1661255,

*8 (N.J. Super. Ct. App. Div. June 11, 2007) (quoting Restatement (Second) of Contracts § 33(2)

(1981)).  If performance cannot be ascertained, then the parties have not entered into a legally

enforceable contract.  Id.; see also Marcangelo, 847 F. Supp. at 1230.

     B. Contract Interpretation

     To determine a party's obligation under a contract, a court must engage in interpretation.

Sumitomo Mach. Corp. of Am. v. AlliedSignal, Inc., 81 F.3d 328, 332 (3d Cir. 1996).  When

interpreting a contract, a court must decide if the terms of the contract are ambiguous.  Id.

Whether a contract is ambiguous is a question of law.  Air Master Sales Co. v. Northbridge Park

Co-Op, Inc., 748 F. Supp. 1110, 1114-15 (D.N.J. 1990) (citing Tigg Corp. v. Dow Corning Corp.,

822 F.2d 358, 362 (3d Cir. 1987)).  A contract, or the portion relevant to the parties' dispute, is

ambiguous if it "is susceptible of more than one meaning."  Sumitomo, 81 F.3d at 332 (internal

quotes and citation omitted).  When interpreting a contract, a court may only "enforce the contract

as written and not make a better contract for either party."  Riad Dev. Co. v. Ringel, Civ. No. 541-

05, 2009 WL 748231, *5 (N.J. Super. Ct. App. Div. Mar. 24, 2009) (quoting Graziano v. Grant,

326 N.J. Super. 328, 342 (App. Div.1999)).  In interpreting contracts, "courts will consider the

'actual words of the agreement themselves, as well as any alternative meanings offered by

counsel, and extrinsic evidence offered in support of those alternative meanings,' reading contract

terms in context."  Jaasma v. Shell Oil Co., 412 F.3d 501, 507-08 (3d Cir. 2005) (citing Barco

Urban Renewal Corp. v. Hous. Auth. of Atlantic City, 674 F.2d 1001, 1009 (3d Cir. 1982);

Restatement (Second) of Contracts §202(2) (1981)).[7]  Even if there is no ambiguity in the terms of

the contract, "evidence of the situation of the parties and the surrounding circumstances is

admissible in aid of interpretation."  Riad Dev. Co., 2009 WL 748231, *5 (internal quotes

omitted) (quoting Great Atl. & Pac. Tea Co. v. Checchio, 335 N.J. Super. 495, 501 (App. Div.

2000)).  In addition, words are interpreted using their "generally prevailing meaning," unless

otherwise indicated.  Vanguard Prop. Group, Inc. v. Trocki, Civ. No. 54-07, 2009 WL 465534, *5

(N.J. Super. Ct. App. Div. Feb. 26, 2009) (citing Restatement (Second) of Contracts § 202(3)(a)

(1981)).

    C. 2004 Contract

       1. Legally Enforceable Contract

The 2004 agreement between the parties is a legally enforceable contract.  First, there was

a meeting of the minds between the parties.  Big M and Dryden entered into the contract for the

---

[7]The Second Restatement of Contracts Section 202 states, in relevant part:

(1) Words and other conduct are interpreted in the light of all the circumstances,
and if the principal purpose of the parties is ascertainable it is given great weight.
(2) A writing is interpreted as a whole, and all writings that are part of the same
transaction are interpreted together.
(3) Unless a different intention is manifested,
(a) where language has a generally prevailing meaning, it is interpreted in
accordance with that meaning;
(b) technical terms and words of art are given their technical meaning when used
in a transaction within their technical field.
(4) Where an agreement involves repeated occasions for performance by either
party with knowledge of the nature of the performance and opportunity for
objection to it by the other, any course of performance accepted or acquiesced in
without objection is given great weight in the interpretation of the agreement.
(5) Wherever reasonable, the manifestations of intention of the parties to a
promise or agreement are interpreted as consistent with each other and with any
relevant course of performance, course of dealing, or usage of trade.

Restatement (Second) of Contracts §202 (1981).

purpose of seeking a tax refund for Big M.  SOF No. 5.  Big M responded to Dryden's mailing

offering to perform a reverse audit for overpayment of sales and use tax.  Edmond Test.  During

the 2004 meeting to discuss the possible audit, Dryden described the services it would provide,

including review of accounts payable documents.  Visone Test.  Further, Edmond testified that he

wanted to enter into the contract to perform a reverse audit because it was a "win-win" situation in

that plaintiff could receive money without having to expend additional funds to collect it.

Edmond Test.  Second, the element of offer and acceptance was present.  Dryden offered to

perform a reverse audit and Big M accepted that service by signing the contract.  Pl. Ex. 1.  Third,

consideration is present because the parties bargained for each other's obligations under the

contract. Visone Test.  Dryden agreed to review Big M's records and apply for a tax refund on Big

M's behalf.  Id.  If the refund were given, then Big M would pay Dryden 35% of the refunded

amount.  Pl. Ex. 1.  Lastly, the terms and obligations under the agreement are certain.  Both

parties agreed that Dryden was obligated to review accounts payable files, chart of accounts and

cost center listing, general ledgers for use tax liability, fixed asset addition records, and any other

supporting documentation in relation to the refund claim, Pl. Ex. 1; Schiavone Test., and submit a

refund claim when it was "mutually agreed upon" by the parties and plaintiff would pay the

contingency fee to Dryden.  Pl. Ex. 1.  Therefore, the 2004 agreement is a legally enforceable

contract.

### 2. Breach of Contract

If a contract exists, then the Court must determine if it was breached.  The essential

elements for "a cause of action for a breach of contract [are] a valid contract, defective

performance by the defendant, and resulting damages."  Coyle v. Englander's, 199 N.J. Super.

212, 223 (App. Div. 1985).  Thus, to establish a breach of contract claim, a party must prove that:

1. The parties entered into a contract containing certain terms.

2. The [promisee] did what the contract required [it] to do.

3. The [promisor] did not do what the contract required [it] to do . . . .

4. The . . . breach, or failure to do what the contract required, caused a loss to the [promisee].

N.J. Jury Instr. Civ. 4.10 A; Nat'l Reprographics, Inc. v. Strom, Civ. No. 08-3969, 2009 WL 1346660, *14 (D.N.J. May 13, 2009) (citing Hutchinson v. Del. Sav. Bank FSB, 410 F. Supp. 2d 374, 385 n. 21 (D.N.J. 2006)).  To recover under a breach of contract claim, the party bringing the suit has the burden of establishing the breach.  Nolan v. Control Data Corp., 243 N.J. Super. 420, 423 (1990).

Plaintiff has proven that the defendant breached the 2004 contract.  Section 2 of the contract states that "[a]s may be mutually agreed upon, [Dryden shall] prepare, file, and process the relevant petition for Refund."  Pl. Ex. 1.  According to Dryden's "Refund Review Engagement Procedures," employees involved in refund reviews are required to "list a brief description and the amount of the potential exposure on the client's vendor list.  If the item is significant, then [the reviewer shall] make a copy [of the invoice] for the client."  Pl. Ex. 2 at 3.  This review procedure directs the reviewer to disclose, regardless of size, any exposures found, even if the engagement did not require Dryden to search for such exposures.  To this end, Hogan listed a series of items for which plaintiff may have had exposure.  Pl. Ex. 5.  None of the items were disclosed to the plaintiff before the refund request was submitted.  Schiavone Test.; Edmond Test.; Visone Test. Twelve of these potential liabilities were listed on the auditor's preliminary report, of which seven were on the final assessment.  Schiavone Test.  Schiavone made a professional judgment that the identified exposures were not significant and unilaterally decided not to disclose these liabilities. Id.  The contract, however, contemplated a joint decision-making process as the filing of the

application was to have been "mutually agreed upon."  P. Ex. 1.  Dryden's obligation under the

contract was to disclose exposures when found so that the client can make an informed decision

as to whether or not the refund application should be filed.  By withholding the information,

Dryden made a unilateral decision and deprived Big M of the opportunity to make an informed

decision as to whether or not to file for a refund.  Dryden thereby breached the mutuality term of

the contract.

Having concluded that Dryden breached the mutuality term in the 2004 contract, the Court

must decide whether or not such a breach was material.  See Ramirez v. Autosport, 88 N.J. 277,

284 (1982) (stating that contract law only permits rescission for material breaches).  A material

breach is one that effects the "essence of the contract."  S.A. Holding Co. v. City of South Amboy,

Civ. No. 07-0944, 2007 WL 2177454, *4-5 (D.N.J. July 26, 2007) (quoting Young Travelers Day

Camps, Inc. v. Felsen,118 N.J. Super. 304, 310 (Essex County Ct. 1972)).  Factors relevant in the

materiality analysis are:

> (a) the extent to which the injured party will be deprived of the benefit which he
> reasonably expected;
> (b) the extent to which the injured party can be adequately compensated for the part of that
> benefit of which he will be deprived;
> (c) the extent to which the party failing to perform or to offer to perform will suffer
> forfeiture;
> (d) the likelihood that the party failing to perform or to offer to perform will cure his
> failure, taking account of all the circumstances including any reasonable assurances;
> (e) the extent to which the behavior of the party failing to perform or to offer to perform
> comports with standards of good faith and fair dealing.

Id. (quoting Restatement (Second) of Contracts § 241 (1981)); see also Neptune Research and

Dev., Inc. v. Teknics Indus. Sys., Inc., 235 N.J. Super. 522, 533 (App. Div. 1989).

Dryden's failure to disclose the potential liabilities to Big M constitutes a material breach

because it effected a fundamental component of the contract.  First, Dryden deprived Big M of the

information it needed to make an informed decision.  Second, Dryden cannot now cure its failure

to disclose the tax exposure or compensate the plaintiff for this deprivation.  Once Dryden filed

the refund claim, the state discharged its obligation to ensure the claim was proper and this course

of events could not be stopped.  Third, Dryden had an incentive to not disclose the tax exposure to

Big M because, if disclosed, Big M may not have permitted the refund request to be filed, and

Dryden would not have had an opportunity to earn its fee, which was contingent on the refund

being filed and approved.  This arrangement undermines Dryden's duty to fulfill the mutual

decision-making component of the contract and its obligation to act in accordance with the

standards of good faith and fair dealing as it presents a situation where its interest in securing a

refund motivates it not to disclose information that may cause the client not to file for the refund.

Fourth, Dryden has forfeited its entitlement to compensation by not disclosing relevant

information to its client.  See Norfolk S. Ry. Co. v. Basell USA Inc., 512 F.3d 86, 94-95 (3d Cir.

2008).  Therefore, Dryden's failure to disclose the potential liabilities to Big M constitutes a

material breach.

Although failure to disclose the exposures breached the agreement, Dryden's failure to

disclose the possibility of an audit resulting from the refund request does not.  First, both parties

are sophisticated business entities with experience in accounting and taxes.  Visone Test.;

Schiavone Test.  Second, Visone testified that she expected the state to audit Big M after the

refund was sought and she cautioned Edmond that this was likely to occur.  Visone Test.  Third,

Big M had been audited in the past when applying for a similar refund.  Visone Test.  Thus, even

if Dryden did not mention that the refund application may trigger an audit, the plaintiff knew that

an audit may occur and thus, even if defendant should have disclosed it, the omission had no

impact on plaintiff's decision to enter the contract.  Hence, Dryden's failure to disclose the

possibility of an audit did not cause the plaintiff to take an action it would not have otherwise taken and even if it were a breached obligation, it would not constitute a material breach.

    3. Remedy

    Because Dryden breached a material term of the 2004 contract, Big M is entitled to terminate the contract. Young Travelers Day Camps, Inc., 118 N.J. Super. at 310. A party who terminates the contract can legally withhold future performance without repercussions. Id. By terminating the contract, plaintiff is entitled to withhold payment under the 2004 contract.

    Big M, however, has not shown it is entitled to recover damages.[8] Plaintiff suggests that the defendant's breach caused it to file the refund application, the application triggered an audit, the audit led to disclosure of unpaid taxes, and the plaintiff's failure to timely pay these taxes led to the imposition of interest and penalties. Although plaintiff abandoned its view that defendant should pay the taxes and penalties, it asserts that Dryden should pay the interest owed to the state for unpaid taxes. Dryden, however, is not responsible for plaintiff's failure to properly pay taxes owed years before their contractual relationship came into existence. The defendant's actions did not cause plaintiff to owe taxes, and therefore it is not responsible for the interest due on taxes plaintiff owed due to its own non-disclosure. See Sorenson v. H & R Block, Inc., Civ No. 99-10268, 2002 WL 31194868, *15 (D. Mass. 2002) (holding that where a party is responsible for their own tax liability, there is no "theory of recovery to shift responsibility" for such taxes or associated interest or penalties because this award would result in "'the windfall of both having used the tax moneys . . . and recovering all interest thereon.'") (quoting Alpert v. Shea Gould

---

        [8] Even if a plaintiff demonstrates a breach of contract, relief in the form of damages are not automatic. Nanavati v. Horizon Blue Cross/Blue Shield, Civ. No. 716-03, 2009 WL 937166, *3 (N.J. Super. Ct. App. Div. Apr. 9, 2009).

Climenko & Casey, 559 N.Y.S. 2d 312, 315 (N.Y. App. Div. 1990); cf. Amato v. KPMG LLP,

Civ No. 06-39, 2006 WL 2376245, *5-6 (M.D. Pa. Aug. 14, 2006) (finding that as a question of

fact, interest could be included in damages calculations when "payment of interest . . . could

actually damage the taxpayer who received negligent tax advice.")  Thus, the plaintiff is not

entitled to damages for the interest.

  D.  2007 Contract

  As stated previously, to establish a legally enforceable contract, a party must prove that

there was a meeting of the minds, an offer and acceptance, consideration, and reasonably certain

contract terms.  N.J. Jury Instr. Civ. 4.10 C; see also Weichert Co. Realtors, 128 N.J. at 435; Am.

Furniture Mfg. Inc., 2009 WL 88922, *2 (quoting Ctr. 48 Ltd. P'ship, 355 N.J. Super. at 405).

The evidence shows that there was no meeting of the minds concerning: (1) compensation for

work Dryden performed after the preliminary report was issued; and (2) the meaning of the term

"assessment" as used in the 2007 contract.  As a result, the 2007 contract is not enforceable.

  1. Compensation

  The 2007 contract purports to expand the services that Dryden agreed to provide and

changes the figure that would dictate the compensation it would receive.  The language of the

contract states that Dryden will "[r]eview the pertinent Client records for overpayment . . . [and]

[p]repare, file and process the relevant petition for Refund or Reductions of Assessments."  Pl.

Ex. 29 at 1.  The contract also states that Dryden will review the records to reduce the "notice of

liability by [the] taxing authority as a result of an audit."  Id.  For this work, the contract purports

to entitle Dryden to a "[c]ontingent [f]ee based . . . on recovered amounts or reductions of

assessments."  Id.   The word assessment is not defined but the definition of the word "refund"

suggests that the words "recovered amounts" relates to money obtained as a result of a refund.  Id.

a. Refund Work

As to compensation for the work on the refund, in 2007, the refund application had been prepared and filed.  Thus, language in the 2007 agreement concerning preparing and filing the petition for refund is surplusage.   As of 2007, however, the refund application had not been approved and was being considered as part of the audit.  Thus, no money had been recovered so the language concerning the "recovered amounts" appears to pertain to the dollars plaintiff would obtain from the refund.  Thus, but for the breach of the 2004 agreement, the 2007 contract contemplated, and the parties do not dispute, that the defendant would have been paid for the work on the refund based upon the refunded amount

b. Audit Defense Work

The parties, however, did not have meeting of the minds concerning payment for services that occurred after the issuance of the preliminary report.  Plaintiff contends that defendant's work after the December 1, 2006 preliminary report was issued was part of its contractual duty to process the refund application for which no additional compensation was due.  The defendant asserts that this work constituted a separate engagement to address the contents of the preliminary report and to reduce the tax amount therein and was being compensated separately.

Even accepting the defendant's contention that the work performed after December 1, 2006 was not part of the reverse audit/refund application engagement,[9] the parties did not reach a

---

[9]The record supports the view that the post-2006 work involved an engagement separate from the refund application project.  First, Schiavone made clear that he needed to have the 2007 contract signed before he began addressing the preliminary report.  See, e.g., Def. Ex. 17 and 19. Second, Dryden asked Big M to ask the state to process the refund application separate from the audit.  In a July 7, 2005 email, Schiavone told Visone that Big M could "choose to have the state

meeting of the minds as to how the defendant would be compensated for the work done in response to the preliminary report.   The 2007 contract states that defendant would receive a contingent fee based upon "recovered amounts or reductions of assessments."  As stated above, recovered amounts appears to be a reference to money that would be obtained from the refund application.  Thus, the other work performed under the 2007 contract would be compensated based upon "reductions of assessments."  Although defendant contends that this refers to amounts in the preliminary report, the plaintiff did not understand it in the same way.  Because the parties did not reach a meeting of the minds concerning the meaning of the word "assessment," they could not have agreed upon the terms for additional compensation.

### i. Plaintiff's testimony as to the meaning of assessment

Visone and Edmond testified that they believe the term "assessment" refers to an event that would occur when Big M receives a final tax bill from the state and that this would only occur when the audit was complete.  Visone Test.; Edmond Test.  Visone also testified that an

---

process the completed refund claim by cutting a check payable to Big M" or "have the State offset the refund against the audit currently in progress" and thereby expedite Dryden's payment for its work on the refund. Pl. Ex. 15. Third, the post-2006 work was for a different purpose. At the time the March 2007 was signed, plaintiff understood it was being audited, the plaintiff intended to persuade the state to reduce the tax numbers in the preliminary report, and plaintiff wanted Dryden to defend plaintiff against the assertions made against it in the report. Visone Test. Fourth, in emails, Shiavone referred to this work as the "audit defense" and Visone never corrected his use or the word or asked for an explanation.  Def. Exs. 10, 15, 16, 19, 20, 35. Thus, the post-2006 work constituted a new engagement for which defendant sought additional compensation.

While it was unrealistic for plaintiff to have believed that Dryden performed this work for "free," it is equally unreasonable for defendant to have believed that plaintiff would have paid Dryden 35% of the amount that Dryden would convince the state to remove from the preliminary report. Edmond emphatically testified that he was not seeking to spend money to recoup money and hence it is unlikely that he would have agreed to the arrangement that triggered payment based upon a reduction of the $1.837,507.18 figure that both plaintiff and defendant knew to be largely unsupported from a simple review of the invoices. Visone Test.; Schiavone Test.

assessment is conveyed in a formal document sent via certified mail and that it contains a demand for payment.  Visone Test.  She testified that the state's email and preliminary report did not constitute an assessment because it was sent before the audit was completed, was not sent via certified mail, was not on official letterhead, and did not contain a demand for payment.  Id.  From plaintiff's point of view, the preliminary report did not constitute an "assessment," and therefore the language basing compensation upon reductions of the "assessment" would not have dictated compensation for reducing a number in the preliminary report.

ii. <u>Defendant's testimony and emails as to the meaning of assessment</u>

Schiavone's testimony was inconsistent on whether or not the preliminary report constituted an assessment.  When asked to identify the state's preliminary report, for example, he characterized the document as "the State's audit assessment for the period of '01 to '04."  Testimony of Joseph Schiavone, dated June 9, 2009, at 32:9-10.  Schiavone also explained that the preliminary report constituted an assessment because it contained liabilities that would become a final tax bill if they were not addressed.  Schiavone Test.  Finally, in describing his post-2006 work, he said his task was to "tak[e] a State's assessment," and "demonstrate to the State that those items don't belong on the assessment." Transcript of Schiavone Test. dated June 9, 2009 at 8:13-17.

In other parts of his testimony and in his emails, however, he did not seem to embrace the preliminary report as an assessment.  In email messages, he referred to the preliminary report as an "assessment" as often as he used the words "workpapers" or "worksheets" to describe it. Def. Exs. 13, 15, 17, 19, 20, 33, 35.   In addition, he testified that preliminary workpapers, like the 2006 preliminary report, "come out prior to the finalization of the assessment." Transcript of Schiavone Test. dated June 10, 2009, at 11:12-13.  He also testified that his post-2006 work involved

-36-

"defending the assessment work papers before assessment."  Id. at 15:5-6.

Thus, some parts of Shiavone's testimony demonstrates that Big M and Dryden's representative both understood that the preliminary report was not an assessment.  Relying on this testimony alone, the Court has ample evidence to conclude that the preliminary report was not an assessment and therefore, reduction in the numbers in the preliminary report did not trigger payment under the compensation clause.

Other parts of his testimony shows that defendant's representative viewed the preliminary report to be an assessment.  Relying on this testimony together with plaintiff's testimony, however, shows that the parties did not have a meeting of the minds as to whether the preliminary report was an assessment.  Because they had different understandings of the word "assessment," they could not have reached a meeting of the minds on the compensation clause.

iii.  Website

Because of the inconsistency within Schiavone's testimony, the Court considered the use of the word "assessment" in defendant's website.  Ridley testified that the website pages presented at trial accurately embodied the contents of the website at the time of the events at issue.  Ridley Test.   According to the website, "[r]eview[s] of the auditor's preliminary work papers" and "[d]ocumentation and presentation of arguments to remove contested items" are performed "prior to assessment."  Def. Ex. 41 at 8.  Thus, the defendant's website suggests that a preliminary report, like the 2006 preliminary report, precedes an assessment.  Using this description of an assessment and applying it to the contract clause at issue, the defendant would not have viewed the 2006 preliminary report to constitute an assessment to which the compensation clause refers.  Thus, the defendant's website undercuts defendant's argument that the preliminary work papers

constitute the assessment and supports plaintiff's view that the compensation was not triggered upon reductions of numbers in the preliminary report because it was not an assessment.

      iv.  <u>New Jersey Tax Law</u>

Because of the inconsistency within the defendant's own testimony about whether or not the preliminary report constituted an assessment to which the compensation clause applies, the Court also consulted New Jersey tax law for a definition of the word.  It is reasonable to consult the tax law to obtain "the generally prevailing meaning" of the word, <u>Vanguard Prop.</u>, 2009 WL 465534 at 5, because it is being used by a tax consultant in a contract it drafted and that entered with the tax department of a large company.

New Jersey's State Uniform Tax Procedure Law and case law define the term "assessment," N.J.S.A. § 54:48-1 <u>et seq.</u>, and confers specific rights to taxpayers who are assessed, <u>see</u> N.J.S.A. § 54:49-18, grants the state with a "presumption of correctness" of its assessments, <u>Kramer v. Dir., Div. of Taxation</u>, 24 N.J. Tax 105, 111-12 (N.J. Tax 2008); <u>see</u> <u>also</u> <u>Atlantic City Transp. Co. v. Dir., Div. of Taxation</u>, 12 N.J. 130, 146 (1953), and provides the state the right to receive payment on the final deficiency assessed.  Before an assessment is made, the State, through the Director of the Division of Taxation, engages in an audit.  Such an audit occurs after an entity files a return or report with the state.  Thus, in sequence, upon receipt of a return or report from a taxpayer, the state may proceed with an audit and request documentation.  <u>See</u> <u>People Express Co. v. Director, Division of Taxation</u>, 10 N.J. Tax  417, 419 (N.J. Tax Ct. 1989). If the taxpayer does not respond to the request for information, then the state may impose an estimated arbitrary assessment pursuant to N.J.S.A. § 54:49-5.  <u>See</u> <u>id.</u> at 419-420.   If the taxpayer provides documents and, after review, the taxing authority finds a deficiency, then the state may impose an assessment for underpaid taxes.  N.J.S.A. § 54:49-6a.   If an assessment

occurs, then (1) the taxpayer is provided notice, (2) the state demands payment, and (3) the state provides a calculation of the tax liability, penalties, and interest owed from the original due date until the date of payment.  See id.  Thus, the assessment document contains two important components: a calculation of all money due and a demand for payment.

After an assessment is issued, the document embodying the assessed amount is deemed "nothing more than a preliminary or proposed assessment" because the taxpayer retains the right to challenge the assessment by requesting a hearing within thirty days of notification of the assessment,  pursuant to N.J.S.A. § 54:49-18.  People Express Co., 10 N.J. Tax at 423.  Thus, the state's "final determination" or "final assessment" is not reached until either challenges are resolved or the time to appeal a proposed or preliminary assessment has passed.  Id. at 423-24; see also N.J.S.A. § 54:49-18 (stating that if the taxpayer protests the proposed assessment within ninety days, "the director shall grant a hearing to the taxpayer . . . and shall make a final determination confirming, modifying or vacating any such finding or assessment.").  After this time period passes, the assessment is deemed presumptively correct, which provides the taxing authority an advantage in tax collection proceedings.  Because of this advantage, various procedural protections exist that give the taxpayer the ability to respond before the assessment is issued.

Under New Jersey tax law, the preliminary report was not an assessment.  It lacked the formality of a calculation of interest and penalties due and a demand for payment.  Moreover, it was disclosed in an email during the audit period, while the taxing authority was still collecting documents needed to determine if an assessment should be made.  Furthermore, there is nothing in the record to show that it constituted the type of action that triggered the thirty-day deadline to request a hearing.  Indeed, the record belies this formality.  The state was engaged in a give-and-

take over one year to identify taxable events.  During this period, the plaintiff and the state entered

tolling agreements that notified the plaintiff of the years for which taxes "may be assessed."  Pl.

Ex. 44 at 1 (emphasis added).  These facts show a formal assessment had not occurred and the

preliminary report did not constitute an assessment.  As a result, any reductions in the numbers

contained in the preliminary report cannot be deemed to be a "Reduction in Assessment" on

which defendant's compensation would be based.  Thus, interpreting the word "assessment" in

accordance with New Jersey law leads to the conclusion that the work reducing the numbers in the

preliminary report was not work on reducing an assessment.   Therefore, the compensation clause

does not apply to Dryden's audit defense work.

> v.  Summary

In summary, the plaintiff's view that the preliminary report did not constitute an

assessment is consistent with the definition under the New Jersey tax law and the defendant's

website.  Only a portion of the defendant's representatives testimony attempted to show that the

preliminary report was an assessment. Thus, at a minimum, the evidence shows that the parties

did not "attach[] the same meaning to a . . . term," namely  "assessment."  Therefore, there was no

meeting of the minds about its use in the contract.  See Restatement (Second) of Contracts §201.

The absence of a meeting of the minds[10] concerning how defendant would be compensated

renders the clause contract unenforceable.

Moreover, even assuming that a meeting of the minds could be found based upon the

_____

[10]Relatedly, to the extent the word "assessment" is viewed as being indefinite because of the different meanings ascribed to it, the Court is prevented from "determin[ing] the existence of a breach and provid[ing] an adequate remedy," Mobilio, 2007 WL 1661255, *8 (quoting Restatement (Second) of Contracts d33(2) (1981)), because it cannot determine when the triggering event for payment is reached and Big M is liable for that payment.

concurring views of the plaintiff, the defendant's website, and New Jersey law that an assessment follows a preliminary report and therefore the preliminary report was not an assessment, the defendant is still not entitled to compensation under the clause. The clause permitted a contingency fee for reductions in assessments, not reduction of numbers in a preliminary report. The defendant only reduced numbers in the preliminary report and did not reduce an assessment. Thus, the contract clause does not provide a basis for payment and plaintiff's failure to pay defendant for these services does not constitute a breach of contract.[11]  The defendant, however, is not without a remedy.

E. Declaratory Judgment

---

[11]The defendant's own drafting decisions lead to this result. The defendant drafted the contract, selected the words and is bound by its word choice. N.J. Jury Instr. Civ. 4.10 H; Driscoll Const. Co. v. State, Dept. of Transp., 371 N.J. Super. 304, 318 (App. Div. 2004) (noting that "where an ambiguity exists in the contract allowing at least two reasonable alternative interpretations, the writing is strictly construed against the drafter."); but see Owens-Illinios Inc. v. United Ins. Co., 138 N.J. 437, 471 (1994) (stating that when the non-drafting party is "sophisticated," the rule resolving ambiguity against the drafter of a contract may not be applicable). The defendant used the word assessment despite knowing none had occurred. This, together with other facts, suggest that the contract was cobbled together to address a situation that it had not anticipated and to do so in a way that did not highlight that it was seeking substantial compensation. In 2007, Dryden (1) knew that it had not disclosed the exposures it found during its reverse audit, (2) had not been paid its contingency fee on the refund application that it submitted, and (3) knew that it would not be paid unless and until the state audit that followed the refund application was completed. Having the experience to know that a significant amount of labor would be required to address the state's report and knowing the payment limits of the 2004 agreement, namely that any compensation would be limited to 35% of the refund amount Dryden needed a new agreement to secure additional compensation. To accomplish this goal, Dryden conveyed a new agreement that bore a title that would suggest to the reader that it was a continuation of an agreement to provide services needed to complete the sales and use tax refund application but whose contents contemplated a different fee calculation model. While plaintiff should not be absolved from its obligation to carefully read contracts it enters, the language in the contract did not really address the situation that the parties confronted, namely an audit defense before an assessment was imposed. The defendant's own drafting decision, including omitting the words "audit defense" from the contract and using the word "assessment" when one had not occurred, left a gap in the contract to defendant's detriment.

Under the Declaratory Judgments Act,[12] "any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C.A. § 2201(a). A declaratory judgment can properly settle a conflict even if there exists another adequate remedy for damages and can be sought in a contract case to determine each party's rights under a contract. Dworman v. Mayor and Bd. of Aldermen, Governing Body of Town of Morristown, 370 F. Supp. 1056, 1076 (D.N.J. 1974); Fed. R. Civ. P. 57 (stating that "[t]he existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate."). Therefore, the Court may entertain a declaratory judgment in a breach of contract case.[13] Id.

A declaratory judgment is appropriate in this case to declare that Dryden breached the 2004 contract and is unable to collect payment thereunder. As discussed above, Dryden materially breached the 2004 agreement by failing to disclose potential liabilities uncovered during the refund review. Since Big M could terminate the contract upon Dryden's breach, Dryden may not collect damages under the contract. Therefore, a declaratory judgment that Dryden breached the 2004 contract and may not collect moneys due thereunder is appropriate.

Plaintiff is also entitled to a declaration that the 2007 contract is null and void because

---

[12]Although the Final Pretrial Order does not indicate whether a declaratory judgment is being sought under federal or state law, the joint Statement of Applicable Law shows that plaintiff seeks relief under the federal Declaratory Judgments Act. See Statement of Applicable Law at 31-33.

[13]The New Jersey Uniform Declaratory Judgments Act, N.J.S.A. 2A:16-50 to -62, also gives a party the right to "obtain a declaration of rights, status, or other legal relations thereunder." Passaic County Bd. of Soc. Servs. v. Commc'ns Workers of Am., Civ. No. L-3273-03, 2007 WL 1827245, *4 (N.J. Super. Ct. App. Div. June 27, 2007) (quoting N.J. Stat. Ann. § 2A:16-53). A party's right to a declaratory judgment in a contract case exists before or after a breach and hence, "a party's right under a contract may be construed either before or after a breach thereof." Id. (internal citations omitted)(quoting N.J. Stat. Ann. § 2A:16-54).

there was no meeting of the minds concerning compensation.  Therefore, the Court declares that

the 2007 agreement is not an enforceable contract.

     F.  Elements of Breach of Fiduciary Duty

     The plaintiff also contends defendant breached its fiduciary duty.  A fiduciary relationship

exists when:

> one party places trust and confidence in another who is in a dominant or superior
> position.  A fiduciary relationship arises between two persons when one person is
> under a duty to act for or give advice for the benefit of another on matters within
> the scope of their relationship.  The fiduciary's obligations to the dependent party
> include a duty of loyalty and a duty to exercise reasonable skill and care.
> Accordingly, the fiduciary is liable for harm resulting from a breach of the duties
> imposed by the existence of such a relationship.

McKelvey v. Pierce, 173 N.J. 26, 57 (2002) (internal citations omitted); In re Cendant Corp. Sec.

Litig., 139 F. Supp. 2d 585, 609 (D.N.J. 2001) (quoting F.G. v. MacDonell, 150 N.J. 550, 563

(1997), citing Restatement (Second) of Torts §874 (1979)).  In the context of a relationship

between an accountant and a client, a fiduciary relationship generally does not exist "when the

accountant is employed to audit financial statements, because the independence required is

'fundamentally inconsistent with status as a fiduciary.'"  In re Cendant Corp., 139 F. Supp. 2d at

609; Interactive Logistics, Inc. v. Answerthink, Inc., Civ. No. 01-214, 2001 WL 1825982, *7

(D.N.J. Dec. 18, 2001).  Outside the independent auditor role, however, "New Jersey has [not]

ruled that an accounting firm may not have a fiduciary relationship with its clients."  In re Cendant

Corp., 139 F. Supp. 2d at 609.  Indeed, "[a] fiduciary relationship may exist . . . between an

accountant and client if their relationship 'goes beyond merely rendering an independent audit and

providing investment advice.'"  Id.; Interactive Logistics, Inc., 2001 WL 1825982, at *7 (quoting

In re Cendant, 139 F. Supp. 2d at 609).

To prove a breach of fiduciary duty, the plaintiff must prove: (1) a fiduciary relationship existed between the parties, (2) a breach of the duty imposed by that relationship, and (3) harm to the plaintiff.  ACE Am. Ins. Co. v. Wachovia Ins. Agency Inc., Civ. No. 08-4369, 2008 WL 4630486, *6 (D.N.J. Oct. 17, 2008) (citing McKelvey, 173 N.J. at 57).  Therefore, for Big M to recover, it must show that Dryden had a fiduciary relationship with Big M, Dryden breached a duty imposed by the existence of their relationship, and that Big M was damaged.

1. Fiduciary Duty

Big M argues that Dryden owed it a fiduciary duty because it held itself out as an expert and instilled trust and confidence in its work. Edmond Test.; Visone Test.  A fiduciary obligation exists whenever one person places special "trust and confidence" in another person upon whom the person relies to exercise discretion and expertise upon behalf of that person.  F.G., 150 N.J. at 563.  A fiduciary relationship exists "when one person is under a duty to act for or give advice for the benefit of another on matters within the scope of their relationship."  Lankford v. Irby, Civ. No. 04-2636, 2006 WL 2828552, *7 (D.N.J. Sept. 29, 2006).

Dryden had fiduciary relationship with Big M.  First, Dryden held itself out as an expert in tax matters. Visone Test; see also Def. Ex. 41.  Dryden solicited Big M via a mailing that advertised its services and Dryden met with Big M to discuss the scope of the service that it would provide to help Big M recover tax overpayments.  Edmond Test.  These events instilled confidence in Big M so that it would hire Dryden to perform the refund review.  Second, Dryden's president describes Dryden as a specialist in the complicated sales and use tax field, Ridley Test., and plaintiff expected defendant to provide training at the end of the review to help improve plaintiff's tax knowledge. Visone Test.  Third, there was an expectation that Dryden would work independently.  In fact, Visone testified that she did not monitor Dryden's work because Dryden

-44-

said that they did not need her assistance other than to gather information it requested.  Visone Test.  Moreover, Dryden made judgment calls that impacted Big M.  As Schiavone testified, he worked independent of Big M, he alone decided whether to disclose potential exposures, and he submitted the refund application without Big M's review.  Schiavone Test.  Fourth and relatedly, Dryden had a superior role as both an expert in the field and in the factual information it uncovered and its evaluation of it.  Based on the above factors, the Court finds that a fiduciary relationship existed between Big M and Dryden.

2. Breach of Fiduciary Duty

Big M argues that Dryden breached its fiduciary duty by failing to disclose the potential liabilities discovered in the refund review.  A fiduciary owes its client a duty of reasonable care and skill while performing its obligations under the relationship.  McKelvey, 173 N.J. at 57.  All fiduciaries are "held to a duty of fairness, good faith, and fidelity."  Estate of Spencer v. Gazvin, 400 N.J. Super. 220, 242 (App. Div. 2008)(quotations omitted)(quoting In re Honig, 10 N.J. 74, 78 (1952)).  When one person undertakes to act for another in a fiduciary relationship, the fiduciary must have undivided loyalty to the client, it may not act in any manner adverse or contrary to the client's interests, and it is forbidden from acting for its own benefit in relation to the subject matter of their relationship.  Gilliam v. Edwards, 492 F. Supp. 1255, 1266 (D.N.J. 1980) (citations omitted); AYR Composition, Inc. v. Rosenberg, 261 N.J. Super. 495, 501 (App. Div. 1993); see also Strawbridge v. New York Life Ins. Co., 504 F. Supp. 824, 829 (D.N.J. 1980) (stating that a fiduciary is forbidden from "tak[ing] an unfair personal advantage of the opportunities of his position in the use of things entrusted to him . . . ." (quoting Bohlinger v. Ward & Co., 34 N.J. Super. 583, 591 (App. Div. 1955)).

The Court finds that Dryden's failure to disclose the potential liabilities to Big M

constitutes a breach of fiduciary duty.  See Silverman v. Bresnahan, 35 N.J. Super. 390, 395 (App. Div. 1955) (stating that failure to disclose facts "material to the business for which [the fiduciary] was employed" is a breach of fiduciary duty and results in "forfeit[ure of] . . . commission."). First, under Dryden's own internal procedures document entitled "Refund Review Engagement Procedures," Dryden was supposed to disclose any potential exposures uncovered during the refund review.  Pl. Ex. 2 at 3.  Exposures were found, Pl. Ex. 5, but disclosure did not occur. Second, the contract envisioned a joint decision-making process concerning the filing for the refund.  See Pl. Ex. 1.  This contemplated Dryden providing information to its client so it could make an informed decision about whether or not to file the refund request based upon information and guidance from its expert consultant.  Big M trusted Dryden to provide information of potential liability before filing the request but Dryden did not.  By withholding the information Dryden prevented Big M from weighing its options with the benefit of all of the facts Dryden had discovered.  Third, Dryden was assured payment only if the refund application was submitted and approved.  Thus, the defendant had the incentive to do whatever was necessary to ensure plaintiff filed the application.  If plaintiff knew there was a risk that the refund would result in paying more taxes, it may not have permitted defendant to file the application.  By withholding information about exposures, Dryden ensured a refund application was filed and hence Dryden acted in its own interest and not Big M's.  Therefore, Dryden breached its fiduciary duty by failing to disclose the potential exposures to Big M before filing for the refund request.

### 3. Damages for Breach of Fiduciary Duty

A fiduciary is liable for damages that result from a breach of its fiduciary duty. McKelvey, 173 N.J. at 57.  Dryden breached its fiduciary duty by withholding information concerning potential tax exposure and thereby prevented Big M from making an informed decision before

filing the refund request.  Although this omission enabled the application to be filed, it did not

cause the tax liability that plaintiff owed or the interest or penalties due on taxes plaintiff failed to

pay.  Therefore, there is nothing in the record to support a monetary award to plaintiff for the

breach.  Rather, the remedy is to forgive plaintiff's obligation to pay for services Dryden

performed in connection with the refund application.

      G. <u>Defendant's Claims</u>

          1. <u>Equitable Estoppel</u>

The defendant has asserted a claim of equitable estoppel, claiming that the plaintiff should

be estopped from not paying Dryden for its work.  To prevail on a claim of equitable estoppel, the

"party must show: (1) a representation or misrepresentation, (2) made with knowledge by the

representor that it would induce action, and (3) detrimental reliance on the representation by the

claimant."  <u>Washington v. Cooper Hospital/University Medical Center</u>, Civ. No. 03-5791, 2005

WL 3299006, *11(citation omitted)(D.N.J. Dec. 2, 2005).  Only "justified and reasonable reliance

warrant the application of equitable estoppel."  <u>Id.</u> (citation omitted).

As it relates to the 2004 contract, the parties each made representations to the other,

namely that plaintiff would provide defendant documents, defendant would review those

documents to determine whether or not plaintiff overpaid its taxes, and the parties would mutually

agree whether or not to file a refund application.  The parties agreed that if an application were

submitted and approved, then defendant would be paid a portion of the refunded amount.  There is

no evidence that plaintiff made any representation that induced defendant to enter the contract on

which defendant detrimentally relied.  The only reason why defendant is not being paid under the

contract is because of omissions it made and not because of anything plaintiff did.  Therefore, the

doctrine does not provide the defendant a basis for relief in connection with the 2004 contract.

As it relates to the 2007 agreement, the defendant wanted to provide, and plaintiff sought out defendant's services, to address the state's preliminary report.  Each had its own interests in doing so, but the ultimate goal was the same: to reduce the figures in the preliminary report, obtain the refund or a credit for the overpaid taxes described in the refund application, and at least compensate Dryden for its work in connection with the refund application.  The parties part company as to whether or not Dryden was entitled to additional compensation for the audit defense work performed in connection with the preliminary report.   The emails support the view that Dryden viewed the audit defense work as being separate from the refund application work and sought a separate agreement to address the extra work and compensation for it.  Dryden was also clear that the work would not begin until a contract was signed.  The contract was indeed signed and work began.  Thus, there was a representation on which Dryden relied when it commenced its work and expended over 1000 hours to address the preliminary report.  While there was reasonable reliance on plaintiff's acceptance of defendant's offer to perform the work, the plaintiff is not estopped from objecting to paying the amount defendant seeks.  The record shows that the parties had no oral discussions before the contract was executed concerning the fee for these services, there was no mutual understanding that the amount would be determined based upon the figures in the preliminary report, and the language of the agreement suggests that the payment would be calculated based upon an event that never occurred.  Thus, it would be wrong to prevent the plaintiff from objecting to the payment that the defendant seeks.  It would be equally wrong, however, to allow the plaintiff to reap significant benefits from the work Dryden performed without paying something for it.

2.  Unjust Enrichment

When parties to contract lack a meeting of the minds, a court may find the contract void and award damages, "not based upon the existence of a contract, but rather . . . based on a quasi-contractual theory of 'quantum meruit.'" Barfield v. Manley, Civ. No. 9124-04, 2005 WL 3730516, *4 (N.J. Super. Ct. App. Div. Feb. 3, 2006); see also Marcangelo v. Boardwalk Regency Corp., 847 F. Supp. 1222, 1230 (D.N.J. 1994) (explaining that where there is no meeting of the minds, "the plaintiff [can be] awarded restitution in the amount by which the defendant has been enriched.").  Although Dryden is not entitled to contractual damages arising from its audit defense work as the compensation clause of the 2007 agreement is not enforceable, Schiavone rendered services that were beneficial to Big M and to allow plaintiff to retain this benefit without compensating Dryden would be unjust.

The quasi-contract remedy of unjust enrichment "rests on the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another."  Callano v. Oakwood Park Homes Corp., 91 N.J. Super. 105, 108 (App. Div. 1966).  Courts "allow recovery in quasi-contract when [(1)] one party has conferred a benefit on another and [(2)] the circumstances are such that to deny recovery would be unjust."  Weichert Co. Realtors v. Ryan, 128 N.J. 427, 437 (1992); see, e.g., Shaprio v. Solomon, 42 N.J. Super. 377, 383-86 (App. Div. 1956) (allowing plaintiff to recover reasonable value of services under quantum meruit theory where there was no meeting of the minds).  A party seeking relief under the theory of quasi-contract, "must establish: '(1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services.'"  Starkey, Kelly, Blaney & White v. Estate of Nicolaysen, 172 N.J. 60, 68 (2002) (quoting Longo v. Shore & Reich, Ltd., 25 F.3d 94, 98 (2d

Cir. 1994) (internal quotations and citations omitted)).  A party need not establish a precise value

for its services for a court to determine that a benefit has been conferred.  See Associates

Commercial Corp. v. Wallia, 211 N.J. Super. 231, 244 (App. Div. 1986) (explaining that although

defendant had not proved the value of repairs made, plaintiff did in fact receive a benefit).

Accordingly, the Court will address whether Dryden has conferred a benefit to Big M and if so,

whether retention of that benefit without compensation would unjustly enrich Big M.

a.  Dryden Conferred a Benefit to Big M

The record establishes that Big M sought Dryden's assistance with the sales and use tax

audit.  Visone specifically asked Schiavone "[h]ow about Dryden coming in and doing [the audit

defense work]?"  Def. Ex. 19.  Schiavone responded "[s]ounds good."  Id.  Thereafter, he

commenced work, which benefitted plaintiff.

Although Visone and  Edmond described that audit defense work as mostly clerical in

nature, Visone Test.; Edmond Test., Schiavone testified that the audit defense included a more

demanding array of tasks similar to the reverse audit work, namely: (1) pulling and reviewing

approximately twenty boxes of account payable files and approximately forty redwells of data, (2)

performing various sorts of volumes of information, (3) searching for invoices where taxes were

paid or gathering supporting documents if payment was not evident, (4) identifying categories for

exemption, (5) contacting vendors and Big M employees to retrieve missing information, and (6)

preparing arguments to support exemptions and removal of items from the state's preliminary

report.  Schiavone Test.  Visone confirmed that this type of work is what was required to perform

an audit defense based upon both her previous audit experiences and the tasks she engaged in

during this particular audit included gathering requested documents, analyzing the records to

determine whether taxes have been paid on that particular invoice, and meeting with the tax

authorities to review the documents.  Visone Test.  Additionally, to enhance the success of the audit, Schiavone created binders containing annotated documents for use in the five meetings with the state.  Schiavone Test.  Although the scope of Visone's participation in meetings with the state auditors is disputed, there is no dispute that Schiavone reviewed Big M's taxable expenses and fixed assets with the state and successfully petitioned the state to remove millions of dollars of taxable items from consideration.  Schiavone Test.; Def. Ex. 35.  Schiavone's organization and diligent work on the audit defense enabled Big M to win tax exemptions.  Hence, the Big M benefitted from Dryden's services.

Moreover, Visone confirmed that at the time of the audit, she worked two days per week, performed other duties on behalf of Big M, was under pressure from the State to complete the review, Visone Test.; see Def. Ex. 26, and as a result, requested Dryden's help to respond to the audit.  Visone Test.  Visone testified that before Schiavone commenced his work in March 2007, no documents had been pulled in response to the State's workpapers.  Id.  Schiavone, not Big M, identified errors in the state's preliminary report, which reduced Big M's total tax deficiency to $178,076.58, Pl. Ex. 33, from the preliminary estimate of $1,837,507.18.  Def. Ex. 12.

To achieve this result, Schiavone spent 1,080 hours on Big M's audit defense.  Schiavone Test.  Although plaintiff's counsel attempted to show that Schiavone over-estimated the time he spent working on behalf of Big M, Visone testified that she did not question this number of hours Schiavone spent in connection with the services he provided to Big M.  Visone Test.  Moreover, Schiavone testified that any days in which he spent less than eight hours working for Big M were offset by additional hours expended on the Big M engagement on other days.  Schiavone Test.  Therefore, the 1,080 hours allocated to engaging in audit defense work for Big M reflects the time Schiavone dedicated to provide a benefit to the plaintiff and plaintiff indeed received a benefit

from these services.  The next issue, therefore, is whether or not allowing plaintiff to keep this benefit without compensating the defendant would be unjust.

                b. <u>Denial of Compensation is Unjust</u>

        A party seeking relief on the basis of unjust enrichment must further "[(i)] show that it expected remuneration . . . [(ii)] at the time it performed or conferred a benefit . . . and [(iii)] that the failure of remuneration enriched [the opposing party] beyond its contractual rights." <u>D.R. Horton, Inc. v. Dynastar Dev., L.L.C.</u>, Civ. No. 1808-00, 2005 WL 1939778, *18 (N.J. Super. Ct. Law Div. Aug. 10, 2005).  Where an expectation of remuneration has been established, there is often "either some direct relationship between the parties or a mistake on the part of the person conferring the benefit."  <u>Callano</u>, 91 N.J. at 109.  Dryden expected compensation for the audit review performed between March 2007 and April 2008.  Schiavone Test.  On January 12, 2007, Schiavone informed Visone that Dryden's Sales Vice President would "draft a contract for Edmond's signature to cover the audit defense services (he already signed a contract for the refund review)."  Def. Ex. 15.  By way of email dated January 15, 2007, Schiavone forwarded "the new contract" to Visone stating that the document "covers both refund review as well as audit defense work."  Def. Ex.16.  Schiavone intended to commence work on the audit once Edmond signed the contract.  Schiavone Test.; Def. Ex. 19.  Further, Schiavone communicated to Visone that the reverse audit provided for in the 2004 agreement was a separate service from the audit defense work that he said was the subject of the 2007 contract.  Schiavone Test.  According to Schiavone, audit defense was considered another major engagement as evidenced by the scope of services section in the 2007 agreement, which included services that required Dryden to "[p]repare, file, and process the relevant petition for Refund or Reductions of Assessments."  Schiavone Test.; Pl. Ex. 29.  As such, the evidence indicates that when Visone invited Schiavone to assist responding

to the state's inquiry that Schiavone expected compensation beyond that contemplated for the refund application work.

Second, as stated earlier, Big M received a benefit from Dryden's services defending the audit.  As a result of Schiavone's work, the preliminary tax liability was substantially reduced.  See Pl. Ex. 33; Def. Ex. 12.  Lastly, the evidence indicates that Big M would be unjustly enriched if Dryden fails to receive compensation for the services plaintiff sought and accepted.  It is undisputed that Visone needed help to respond to the state's audit due to her part-time status, other duties, and the pressure of completing the review for the state.  See Visone Test.  Dryden agreed to undertake various tasks to reduce Big M's potential tax liability, Schiavone Test., and, as an external consultant, expected to be compensated.  Although Visone was under the impression that Big M would not be billed for the audit defense work because Arthur Consulting provided similar services without charging a fee, Visone Test., there is no evidence concerning the amount of work Arthur Consulting performed or the hours spent doing it from which to determine if her expectation was reasonable.  Schiavone dedicated 1,080 hours over a one-year period pulling documents, reviewing invoices for tax payment, and preparing arguments to win tax exemptions.  Schiavone Test.  Plaintiff had a risk of high exposure from tax errors plaintiff made long before Dryden came on the scene.  Dryden's comprehensive review and thorough analysis of tax liability and advocacy before the state taxing authority concerning these errors, Schiavone Test., reduced plaintiff's tax debt and it is unreasonable to credit the view that this work would be "free."  It would also be unjust to deny Dryden compensation for the beneficial audit defense services rendered to the plaintiff to reduce a tax debt that predated plaintiff's relationship with Dryden and that Dryden did not cause.  For these reasons, the Court will award Dryden the reasonable value of the audit defense work to prevent the unjust enrichment of Big M.

c.  Remedy

Because Dryden conferred a benefit and reasonably expected payment, it is entitled to "recoup the reasonable value of services rendered."  Weichert Co. Realtors, 128 N.J. 437. Therefore, although the Court found that the contingent fee agreement embodied in the 2007 contract to be unenforceable, Dryden "is entitled to recover the reasonable value of [its] services under a quantum meruit theory" in the form of an hourly rate comparable to a rate charged for similar services.[14]  Starkey, Kelly, Blaney & White, 172 N.J. at 67 (holding that a lawyer whose contingent fee could not be awarded because the contract was invalid received an hourly rate for his legal services under quantum meruit).

Here, the defendant will be compensated at an hourly rate calculated based upon the compensation it expected to receive in connection with the refund application.  Plaintiff's witnesses did not question Schiavone's representation that he expended approximately 1,300 hours working on behalf of Big M, with 220 hours devoted to Big M's reverse audit and 1,080 hours spent on performing audit defense work.  Schiavone Test.; Visone Test.  Big M expected to pay a contingency fee of "35% of all refunds,"  Pl. Ex. 1, and the refund credited to Big M's tax liability totaled $56,083.05.  Pl. Ex. 33.  Therefore, had defendant not breached the 2004 contract, Big M would have paid Dryden a fee of $19,629.07 for the refund work.  See id.  As indicated above, Schiavone expended 220 hours working on Big M's reverse audit and dividing these hours into the $19,629.07 produces an hourly rate of approximately $89.22.  Although reverse audit and audit defense work focus on slightly different things, Schiavone Test.; Ridley Test., the tasks

---

[14] Although Schiavone testified that audit defense work is usually compensated on a contingency rate, the hourly rate formula described herein results in compensation similiar to what plaintiff expected to pay for similar services.

performed for both services were similar, Schiavone Test.  For this reason, the Court finds that the hourly value of Dryden's audit defense services is comparable to the value Big M was willing to pay Dryden for the reverse audit.  Schiavone dedicated 1,080 hours completing tasks for the audit defense, which included gathering and reviewing documents and presenting arguments to win tax exemptions on each of the hundreds of items in the preliminary report. Schiavone Test.  The Court therefore finds that the reasonable value of the audit defense work is an hourly rate of $89.22 for each of the 1,080 hours spent on this task.  As a result, Dryden is entitled to recover $96,357.60 for the audit defense service it provided to plaintiff to prevent the unjust enrichment of Big M.

## IV. <u>CONCLUSION</u>

For all of these reasons, it is ordered, adjudged, and declared that:

1.  Defendant Dryden breached the 2004 contract and its fiduciary duty to Big M by failing to advise Big M of potential sales and use tax liabilities that Dryden had identified when it examined Big M's records in preparation of the tax refund claim.

2.  Big M's obligation to pay Dryden under the 2004 agreement is terminated.

3.  The March 6, 2007 letter agreement is not an enforceable contract because there was no meeting of the minds between the parties concerning compensation for services provided under the agreement.

4.  Big M was enriched by Dryden's audit defense work.  To prevent unjust enrichment, Big M shall pay Dryden the fair and reasonable value of its services in the amount of $96,357.60.

5.  There is no cause of action on the equitable estoppel claims.

6.  Each side shall bear its own costs.[15]

A judgment consistent with this Opinion will be issued.

s/Patty Shwartz
UNITED STATES MAGISTRATE JUDGE

Date: June 29, 2009

---

[15] Each party prevailed on some of their claims.  As such, the Court exercises its discretion under Fed. R. Civ. P. 54 and orders that each party bear its own costs.  Fed. R. Civ. P. 54; In re Paoli R.R. Yard PCB Litigation, 221 F.3d 449, 458 (3d Cir. 2000); see e.g, Stafford Investments, LLC v. Vito, Civ. No. 04-3182, 2009 WL 1362513, *11  (E.D.Pa. May 14, 2009).